IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 7, 2023 Session

## CHARTER COMMUNICATIONS OPERATING, LLC v. MADISON COUNTY, TENNESSEE, ET AL.

**Appeal from the Chancery Court for Madison County**
**No. 80461      Robert E. Lee Davies, Senior Judge**

————————————————————

**No. W2022-01025-COA-R3-CV**

————————————————————

This appeal involves a bid awarded by a county finance department and upheld by the county's finance committee after a bid protest hearing. One of the service providers whose bid was not selected filed a petition for common law writ of certiorari in chancery court. After reviewing the administrative record, the chancery court concluded that the finance committee's decision was arbitrary and capricious and unsupported by material evidence and remanded for the county to rebid the contract. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

James I. Pentecost and Haynes T. Russell, Jackson, Tennessee, for the appellant, Madison County, Tennessee.

Sara E. Barnett and Charles H. Barnett, IV, Jackson, Tennessee, for the appellant, Jackson Energy Authority.

Russell B. Morgan, Henry M. Walker, and Richard W. F. Swor, Nashville, Tennessee, for the appellee, Charter Communications Operating, LLC.

## OPINION

### I.    FACTS & PROCEDURAL HISTORY

In December 2020, the Finance Department for Madison County, Tennessee, issued an "Invitation to Bid" for a multi-year contract to provide wide area network digital transmission circuits and internet access service for the Jackson-Madison County School System. The competitive bid was for a three-year contract, to begin on July 1, 2021, with two possible twelve-month extensions. Four service providers submitted proposals in response to the competitive bid: Jackson Energy Authority ("JEA"); Charter Communications; WANRack, and Thomas Consultants. JEA was the current provider of such services for the School System pursuant to an existing contract that began in 2016 and was set to end on June 30, 2021. JEA bid $30,350 for the wide area network connection and $10,000 per month for the internet access service. Charter bid $26,000 for the wide area network connection and $4,800 per month for the internet access service.

Madison County operates under the County Financial Management System Act of 1981, codified at Tenn. Code Ann. § 5-21-101, *et seq*., and it has adopted purchasing policies and procedures pursuant thereto. The County's policies and procedures provide,

> Formal bids . . . shall only be awarded by the County Finance Department <u>after</u> an award recommendation has been made, received and approved by the Finance Department. The requesting department, office or agency must enter all required documents into Munis for a purchase order to be generated and funds encumbered.

In addition, the County's purchasing system must provide that "[p]urchases and contracts shall be awarded based on the lowest and best bid[.]" Tenn. Code Ann. § 5-21-119(b)(3). The County's policies and procedures state that "diligence must be given to securing the lowest price possible."

On March 7, 2021, the Director of Technology for Jackson-Madison County School System, Christopher Sueing, sent an email to the Purchasing Director for Madison County with the subject line, "Internet and Circuits, WAN Decision." Within this email, Mr. Sueing first apologized for the length of time it had taken "to send you an answer to wh[y] we choose JEA as our provider." He then included four bullet points in his email:

- JEA has had a 100% uptime other than a couple times that people have knocked down utility poles that also had a school fiber line connected.
- JEA has a fiber termination at each school allowing for 10 GIG connectivity if needed.
- JEA is currently providing access to a concrete secured bunker that houses several of our mission critical servers.
- Being local JEA provides a level of personalized service to the district that cannot be matched.

In closing, Mr. Sueing stated, "While JEA is not the cheapest they are certainly the best choice for JMCSS." The Purchasing Director, Ms. Rankin, responded by asking Mr. Sueing to "[p]lease forward the information we discussed on the 4 submitted proposals for which you have chosen JEA. I cannot submit the award without the information."

Two weeks later, on March 23, 2021, the School System executed a contract with JEA for the services beginning July 1, 2021. On March 24, 2021, the School System submitted a federal funding request for participation in the "E-Rate" program, which enables eligible school systems to obtain affordable broadband internet service at discounted rates. The deadline for applications for E-Rate funding was March 25, 2021. However, at that point, the Finance Department had not awarded a formal bid. Upon learning this information, Charter notified the Finance Department of its intent to protest the bid award and requested a bid protest hearing.

On April 15, 2021, the Finance Department issued a "Bid Award Notification" to the four service providers who submitted bids, notifying each of them that the bid had been awarded to JEA "[b]ased on the information received from consultant, Rosemary Enos." The bid award notification stated that JEA's bid met Madison County's requirements and specifications and that the award was made "based on the lowest and/or best proposals received." Later that afternoon, a bid protest hearing was held before the Madison County Finance Committee. At the beginning of the hearing, the attorney for Madison County explained the bidding process to the members of the Finance Committee. Counsel explained that the school system had utilized the services of "an E-Rate consultant" for evaluating the bids. He explained that the School System had communicated to the Finance Department its desire for the bid to be awarded to JEA, but the Finance Department had requested additional information prior to awarding the bid. Thus, counsel conceded that a "misstep" had occurred on March 23 when the School System communicated an acceptance of the bid to JEA before the Finance Department had issued an award letter, but he claimed that this occurred because of the March 25 deadline for participating in the E-Rate program. The county attorney stated that the Finance Department had received supporting information from the E-Rate consultant and from the School System regarding its preference for JEA's bid, and after the Finance Department took all of this into account, it issued a bid award letter to JEA.

Next, Madison County's attorney summarized the order of events that would occur at the bid protest hearing. He explained that Charter would present its position first, followed by JEA, and then a representative of the Finance Department would explain its decision to award the bid to JEA, with the assistance of the E-Rate consultant, Ms. Enos. He noted, however, that the hearing was "informal." He explained that members of the Committee could ask questions at any time but participants could not question one another. Counsel informed the Committee members that at the conclusion of the hearing, they could vote to uphold the bid award to JEA, to set aside the award and award the bid to another vendor, or to withdraw the bid completely.

Charter's attorney began with an opening statement summarizing its position. First, counsel argued that there was a "fatal flaw[]" in the competitive bid process because the formal bid award from the Finance Department had not occurred at the time when the School System signed the contract with JEA and submitted its funding request. Next, counsel emphasized that applicable laws required selection of the "lowest and best" bid, and he contended that Charter's bid was both the lowest and the best.

Charter's attorney and one of its sales managers for state and local education then presented a slideshow about Charter and its services. The sales manager, Lee Brones, stated that he had a lot of experience with the E-Rate program and considered himself an expert on it, as he had received annual training on the subject for the last twenty years. In the course of his presentation, Mr. Brones discussed some documents that Charter had obtained from Madison County pursuant to an Open Records Act request. The first document was an "E-Rate Evaluation Worksheet" from the School System, which compared and scored each provider's proposals for both the internet access service and wide area network. For the wide area network bid, JEA received an overall score of 99 out of 100 points, Charter received 67, WANRack received 55, and Thomas Consultants received 46. For the internet access service bids, of which there were only three, JEA received 98 out of 100 points, Charter received 67, and WANRack received 57. Mr. Brones was critical of this scoring. For example, he pointed out that JEA's monthly fee for internet access service was $10,000, while Charter's was only $4,800. However, Charter received 25 out of 25 possible points in the category for the price of E-Rate eligible service, while JEA received only two points less, with a score of 23 out of 25 points. In all other categories, JEA received perfect scores. Thus, Mr. Brones suggested that the scoring was arbitrary. He claimed that Charter's bid was $343,800 less over the life of the contract and that Charter's service "would have cost you nothing to implement except of internal time of staff having to make some changes, the cost of change, soft costs that could have been employees[.]"

Next, Mr. Brones analyzed the March 7 email from the School System's Director of Technology to the Purchasing Director for Madison County, in which he had stated that JEA was "not the cheapest" but was "certainly the best choice for JMCSS," with four bullet points regarding why the School System had chosen JEA. Regarding three of those reasons, "uptime" in service, fiber termination and connectivity, and localized service, Mr. Brones claimed that Charter's service was equal with JEA's service on each point. The fourth reason listed by the Director of Schools was that JEA was "currently providing access to a concrete secured bunker that houses several of our mission critical servers." Mr. Brones suggested that this fact was totally irrelevant because "in E-rate there are very rigid rules that you can't give something free in order to get a bid on something that's E-rate eligible. That's a big no-no, you can't do that, you can't do quid pro quo, we'll give you this if you give us that[.]" Thus, Mr. Brones said "the fact that you all house that – that you all are able to house some servers for free in [JEA's] warehouse, [that's] against

the law."

Finally, Mr. Brones discussed another document Charter had obtained from Madison County pursuant to its Open Records Act request that was entitled: "Notes from the evaluation conversation." This document contained what appear to be "pros and cons" for each of the four proposals submitted by the four providers. The first bullet point on the list was that changing IP addresses would be costly, both financially and in terms of time. Regarding this point, Mr. Brones estimated that changing the IP addresses would require about "20 hours of work" and "20 to 30 hours of planning." However, he stated that all of this work could be performed "by internal staff so it's soft costs." He said that even if this work cost $40,000, it would not compare to the $350,000 in savings over the life of the contract with Charter. According to the notes from the evaluation conversation, another point of discussion was that Charter's bid stated that it "may" charge additional fees for the after-hours work requested by the School System. Mr. Brones acknowledged this possibility but again said these fees would not be so high as to negate the savings Charter could offer over the life of the contract. Another bullet point listed in the notes about the proposals was that JEA had a network operation center located in downtown Jackson, but Mr. Brones said that Charter had an operation center in Jackson as well. Another bullet point noted that JEA could achieve service by July 1, while Charter's timeframe for installation was estimated, and there was no guarantee that Charter could get service "up-and-running" by that date. Mr. Brones stated that Charter's "standard time" was 90 to 100 days but admitted "we don't guarantee it." Still, he suggested that there would have been "plenty of time" at the time of the bidding. He also claimed that the July 1 date was really immaterial because, he said, it is common practice in the industry for E-Rate funding to be continued for a previous carrier until the new carrier is ready to provide service. For other items listed in the notes, Mr. Brones similarly stated that Charter and JEA were equivalent on each point.

In conclusion, Mr. Brones suggested that there was a real danger of E-Rate funding being denied once the School System's application was reviewed at the federal level because the School System had not chosen the "lowest and best" bid, *i.e.*, Charter. Members of the Committee also asked Mr. Brones a couple of questions. Charter's counsel then presented a closing argument, reiterating Charter's position that the process was fatally flawed by the timing of the bid award and that Charter's bid was the lowest and best. He also suggested that the issue with the School System's servers being housed in the JEA bunker was "going to cause big problems" when the federal government reviewed the E-Rate funding application because, in the absence of any evidence that rent was being paid, JEA had given a "freebie" to the School System, which was "prohibited in the competitive bid process." Charter introduced numerous exhibits before the Committee as well, including the bids by Charter and JEA, the email from the Director of Technology, the scoring matrix, the notes from the evaluation conversation, the bid award notification, the current and previous contracts between JEA and the school system, the E-Rate funding request submitted by the School System, various policies and procedures, and other

documents.

Next, the Committee heard from a representative of JEA who explained that JEA had been providing service to the School System for over fifteen years. Thus, he noted that JEA's bid did not address construction because its network had already been built. He said JEA had established a great working relationship with the School System and each of the schools as well, and he noted that JEA had been recognized by the Tennessee Department of Education in connection with the district's connectivity. In response to questions by a Committee member, the JEA representative also described JEA's local presence and the advantage of having network engineers working in the bunker alongside the School System. To the extent that Charter had insinuated some illegality regarding the servers, the JEA representative stated that there were "absolutely" charges for that equipment storage.

Next, the Committee heard from Madison County's Finance Director. She explained that the Finance Department had awarded the bid to JEA after hearing input from a consultant. Thus, the consultant, Ms. Enos, made a presentation as well. Ms. Enos said that she had been working as an E-Rate consultant for 24 years, since the beginning of the E-Rate program in 1997. Ms. Enos opined that Madison County's bid process was open and fair, with full competition. She explained that the bid scoring matrix was included in the invitation to bid so that service providers would know what factors would be used in evaluating the bid responses. Ms. Enos explained that the matrix is found on the government-operated website for E-Rate funding, which contains examples on how to evaluate a bid with a bid matrix. Although multiple factors can be included within the matrix, she said the one "hard and fast" rule is that price must be the most heavily weighted factor in the matrix. However, she explained that this primary factor only relates to the price of "E-Rate eligible services." Ms. Enos noted that the bid matrix used by the School System weighted the price of E-Rate eligible services at the highest level of all the factors, which was 25 possible points. The second-most weighted factor on the School System's matrix, at 20 points, was entitled, "Other Cost Factors (including price of ineligible goods and services, price of changing providers, price for breaking contract, contract terms and conditions, etc.)." Ms. Enos noted that this factor would include the costs related to the network operation center being located offsite. She explained that the so-called bunker is actually a "network operation center." Ms. Enos said that having the network operation center off-site is "the best practice in the world of school districts" due to threats such as lightning or tornadoes. She said that having the equipment offsite "preserves the integrity of the school district." Ms. Enos explained the considerations relevant to the network operation center and also answered questions from Committee members:

> Ms. Enos: Probably the number one factor that came up after[,] which is listed second[,] is the other cost factors because of the network operating center being offsite, we know that if we were to change to a new provider and it doesn't matter whether it's [Charter] or WANRack or Thomas

- 6 -

Consultant Incorporated who also bid, if we switch to anyone other than JEA we knew that we had an outright cost right now that the school district would be paying within the next 30 to 60 days between 600 and $750,000 to move that equipment out of that bunker/network operating center, that that will be a fee that the school district will be required to pay tomorrow, if we move out of the JEA network operation center.

[Committee member] Mr. Walls: Who would that fee be paid to?

Ms. Enos: Whoever, that fee would be paid to whoever we choose to move the equipment, the down time that the equipment is turned off, the possibility of having to replicate the equipment because you can't, for instance, we couldn't turn off the security in the school district we would have to build a new network and then transfer it over and turn off the old equipment. So there's the possibility would you buy a piece of equipment or would you turn it off and have the down time, what's absolutely essential to run, that 600 minimum is the essential pieces of equipment that the school cannot turn off for day to day activity.

Ms. Enos said this estimated cost would be incurred if the School System changes to any other provider.

Ms. Enos added, "on top of that [is] the IP address issue." She stated that twenty hours would be needed *per server*, and the School System had 111 servers in the network operation center. Accordingly, Ms. Enos calculated 2,220 hours of work for changing all of the servers. Noting that this sum exceeded the number of workday hours in one year, Ms. Enos said that "one person in-house" simply could not complete the work required for all of the servers. She opined that "multiple people" would have to be brought in to complete the job, at a cost of $150,000.

In sum, Ms. Enos explained to the Committee that if the School System makes a change in providers, it will have to ask for "more money to make these changes" for the equipment in the network operation center. She also noted that this cost is not funded by the E-Rate program. Ms. Enos acknowledged that this was "one of the main factors behind choosing the JEA network to stay in place." She explained that the JEA bid was more, "but overall you're still saving quite a bit of money to leave that equipment where it is and not having [to] rebuild that connection or rebuild it offsite." She emphasized that the "lowest and best doesn't mean lowest price." Ms. Enos added, "[D]o you want to take out of your pocket 600,000 [or] $700,000 to change[,] to save $350,000 possibly in your fees[?]"

Lastly, Ms. Enos said that another item that was considered and discussed during the decision-making process was the July 1 start date for service. She noted that the School

System's current contract with JEA would end on June 30 and that it would convert to a month-to-month arrangement thereafter. Ms. Enos said she had been involved with "a lot" of other school systems that were changing service providers and their scheduled start dates were not met due to the various issues that can occur. In this scenario, she said the school system must pay "month-to-month-to-month." Ms. Enos insisted that "E-Rate does not change on a dime, [so] you can't just say, okay, I'm going to make a change, I don't know what day it's going to be." According to Ms. Enos, "They require you to put the day down your change is, if you go over that day, you cannot change that day, they say you're on your own, you might have a month or two you're going to be paying out-of-pocket [one] hundred percent where E-rate will not give you the discount." Ms. Enos noted that the School System was currently receiving a 90 percent discount through the E-Rate program.

In conclusion, Ms. Enos said these were all issues that were considered and discussed during the selection process. She believed that the School System's scoring matrix would withstand scrutiny during the E-Rate review process considering the "best price and cost effectiveness." Even considering the price of E-Rate eligible services over the term of the contract, she believed the "other cost factors" justified staying with JEA because of the total cost involved.

Mr. Brones, from Charter, then attempted to ask Ms. Enos a question about the $600,000 cost for moving the network operation center. Madison County's attorney reminded him that participants could not question one another, but he said that members of the Committee could ask questions as they deemed appropriate. Various members of the Committee then questioned Ms. Enos directly about her calculations and opinions:

Mr. Deaton: And how did you establish the $650,000 cost?

Ms. Enos: So we took the equipment that exists within the network operation center and we factored in what were those items, what would have to happen to them, which ones were essential that we could move right away, which ones were not essential so we left that price out and then we talked about what that cost would be, how many people would have to be involved to move it, how many people would have to be involved to set it back up.

And we also just had another discussion about what's the rental fee leaving where the network operation center is, could we find the same kind of rental fee that we pay today so you would have an ongoing cost which right now you pay like around – I am not even sure what that is today maybe like $2500 a month but we were thinking we could find probably something similar to $3000 that 3600 a month additionally you would pay, but we didn't – that's not really another cost factor because you're paying it today. The other cost factor really comes into play about moving and having to recreate the essentials without dropping the service.

Mr. Harris:    And the cost to move these pieces of equipment, I don't know the right terminology, but it's based off of your experience that you've seen in other districts and in other businesses?

Ms. Enos:    Right, and also the IT department, we had that big discussion with all of the IT folks in that department, we discussed what equipment is essential and what is the cost factor there, how many hours would it take of their time and outside time.

And, you know, [Charter] talked about soft factors and I agree completely, but there's a point where a soft factor is no longer soft because if it would take one person a whole year to change all of your server IP addresses, that's not soft anymore, you're going to go outside and hire people to make those changes happen within a two week time period so that that cutover can really happen at a good time frame and not you're not just doing it internally, it would be going out and hiring people to do that.

Mr. Walls:    The equipment, when it is – where is it moved to if it is moved out of the NOC would it be relocated to another service provider facility or to the school system or –

Ms. Enos:    Probably not the school system, that's not a best practice because then if something happens internally it's going to affect that school, you know, that operation center.  In most cases they're cloud-based but a lot of these products are not cloud-based, we have to have pieces of equipment for them.  So they would be in a place that either is somewhat local, you can find some place in Jackson, I know there is another place I think that the City uses that we talked about and there is also out of state that you could go to possibly but you try to keep it close because there are – sometimes there are issues where you have to go and take care of some pieces of equipment yourself and touch and so that you would want to have it as local as you could but we did talk about where else would we put it and it could be another service provider.  There's – I know that most service providers do have network operation centers and you can rent spaces from them, it's called racks and you might rent a rack or two from them and put your equipment in it.

With no further questions from Committee members, this concluded the presentation by Ms. Enos.  The six Committee members then voted unanimously to uphold the bid award to JEA.

Charter subsequently filed a petition for common law writ of certiorari in chancery court, seeking review of the decision of the Finance Committee.  Charter maintained that the School System acted unlawfully by prematurely entering into a contract with JEA

before the Finance Department awarded a bid, and therefore, the Finance Committee acted unlawfully by "upholding the illegal award." Charter also argued that its bid was the lowest and best, so the Finance Committee's decision to uphold the bid to JEA was illegal, arbitrary and capricious, and unsupported by material evidence. Charter alleged, upon information and belief, that the School System had not received any letter approving its application for federal E-Rate funding. It asked the chancery court to either reverse the decision of the Finance Committee and award the bid to Charter, or invalidate the award and order the Finance Department to reevaluate the bids in accordance with applicable law.

The chancery court granted the writ and directed that the administrative record of the proceedings before the Finance Committee be filed with the court. After reviewing the administrative record and considering the parties' briefs,[1] the chancery court entered an order reversing the decision of the Finance Committee and remanding for the contract to be rebid. In its order, the chancery court began by reciting the history and timeline regarding the bid process, the signing of the contract, and the official bid award. Within this discussion of the procedural history, the order stated that the School System had entered into the contract "even though the Finance Department had not made a recommendation to award the bid to JEA as required." However, this fact was not discussed further or analyzed as providing a basis for reversal. Instead, the chancery court focused on the evidentiary basis for the Finance Committee's decision.

The chancery court first made several "observations" regarding what it called "the matrix applied by the Finance Committee to award the contract." For the category regarding the price of E-Rate eligible services, the chancery court stated that "the Committee awarded 25 points (the maximum) to [Charter], but it awarded 23 points to JEA." The chancery court found "no justifiable basis" for this scoring given the disparity in the price of the services. It found that "the Committee gave JEA 100% of the maximum points" in other categories, while Charter received "significantly lower" points but "offered the same benefits." The court did note, however, that "the Committee awarded [Charter] an 8" out of 20 points for the category of "other cost factors" and acknowledged that this "may be justified based upon removing servers from the concrete bunker owned by JEA." The court provided a detailed analysis of the scoring for each other category, comparing the scores received by Charter and JEA, and concluded that some "cannot be explained" and were "impossible to reconcile." Thus, the chancery court stated that the scores, with the exception of the "other cost factors" score, "appear to be arbitrary and capricious."[2]

"However," the court added, "that does not end the Court's inquiry." The court recognized that "[t]he proof before the Finance Committee really seemed to turn on the

---

[1] JEA attached to its brief a funding commitment letter indicating that the School System's application for E-Rate funding had been approved.

[2] It is not clear from the record why the chancery court stated that the bid matrix was scored by the Committee or that the Committee awarded certain points. The already-completed score matrix worksheets were presented as an exhibit at the hearing before the Committee.

report of the consultant, Ms. Enos, who told the Committee that it would cost $600,000 to $750,000 to move their equipment from the concrete bunker owned by JEA." It also noted her statement that "it would take 20 hours to change the IP address for 111 servers, which she estimated would cost $150,000." Still, the chancery court found that the Committee did not hear "the basis for these conclusions by Ms. Enos." The chancery court reasoned:

> What is missing, is the documentation to backup anything testified to by Ms. Enos. Where is the list of items that were essential? Where is the list that shows how much these items cost to move? Where is the list of how many people it would take to move? Where is the evaluation of whether this would be out-of-pocket costs or soft costs?
>
> Perhaps more importantly, if moving the equipment and changing the IP address for servers is such a critical factor in awarding this contract, then this should have been part of the competitive bid process so that all of the other competitors could submit bids and address this issue. The school district would be much better informed, and the Finance Committee could evaluate with much better exactitude what these costs would be. The bid process should also incorporate into the bid the rental fee for this equipment, which apparently was an issue between JEA and [Charter] that went unresolved. In other words, although Ms. Enos gave an opinion, she was unable to give any specific facts to support the basis of her opinion. If this was such a critical component of the decision to award this contract, all of this should have been incorporated into the bid process so that every competitor would have the opportunity to address it.

In conclusion, the chancery court stated that "[t]he decision of the Finance Committee to award the contract to JEA was arbitrary and capricious based upon the scoring of the bid matrix." It further found that "there was no material evidence to support the conclusions given by the Committee's expert that the 'other costs' to move the equipment would amount to an additional $600,000 to $750,000 and an additional $150,000 to change the IP addresses." The order stated that "[t]he Committee needs to be provided with the basis for these conclusions and the documentation to support these conclusions." The chancery court remanded the matter to the Finance Committee "to rebid the contract."

Madison County and JEA each filed a separate notice of appeal to this Court.

## II. ISSUES PRESENTED

Madison County presents the following issues for review on appeal:

1. Whether the trial court erred in holding that the Madison County Finance Committee's decision to award a competitive bid to JEA was arbitrary, capricious, and not supported by material evidence.

2.      Whether the trial court impermissibly reweighed the evidence before the Finance Committee by challenging the intrinsic correctness of the School System's bid matrix and substituting its own judgment and opinions.

3.      Whether [the] trial court impermissibly inquired into the intrinsic correctness of the School System's independent consulting expert's opinions.

JEA presents the following issue:

1.      Did the Chancery Court err when it overturned the decision of the Madison County Finance Committee and held that the Finance Committee's decision to award the bid to JEA was arbitrary and capricious and not supported by any material evidence?

In its posture as appellee, Charter frames the issues as follows:

1.      Did the Chancery Court properly grant a writ of certiorari due to Madison County's improper bid award to JEA, which was arbitrary, capricious, illegal, and not supported by material evidence?

2.      Did the Chancery Court err by not awarding the bid to Charter based on the bid award to JEA being arbitrary, capricious, illegal, and not supported by material evidence?

For the following reasons, we reverse the decision of the chancery court and remand for further proceedings.

### III.   STANDARD OF REVIEW

"The scope of review afforded by a common-law writ of certiorari is extremely limited." *Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 903 (Tenn. Ct. App. 2006) (citing *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2000)). Courts reviewing a decision under a common law writ of certiorari are employing a "limited and deferential standard." *Sporting Club of Tenn., Inc. v. Marshall Cnty. Tenn. Bd. of Zoning Appeals*, No. M2021-01361-COA-R3-CV, 2022 WL 4349796, at *5 (Tenn. Ct. App. Sept. 20, 2022). The Tennessee Supreme Court has described the common law writ of certiorari and its scope of review as follows:

A common-law writ of certiorari is an extraordinary judicial remedy. *State v. Lane*, 254 S.W.3d 349, 355 (Tenn. 2008) (quoting *Robinson v. Clement*, 65 S.W.3d 632, 635 (Tenn. Ct. App. 2001)). The scope of the judicial review available through a common-law writ is quite limited.

*Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d 359, 363 (Tenn. 2007); *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 903 (Tenn. Ct. App. 2006).

The reasons for the writ's limitations on the court's ability to review an agency's decision are particularly important in cases such as this one. These limitations are grounded in the doctrine of separation of powers found in Article II, Sections 1 and 2 of the Tennessee Constitution. *See* Ben H. Cantrell, *Review of Administrative Decisions By Writ of Certiorari in Tennessee*, 4 Mem. St. U. L. Rev. 19, 21 (1973). The General Assembly cannot require the Judiciary to perform functions that are not essentially judicial. *In re Cumberland Power Co.*, 147 Tenn. 504, 508, 249 S.W. 818, 819 (1923) (quoting *Muskrat v. United States*, 219 U.S. 346, 352, 31 S.Ct. 250, 55 L.Ed. 246 (1911)). Likewise, the Judiciary may not, on its own initiative, undertake to perform functions that are not necessarily judicial and that have been assigned to other branches of government. *See Hoover Motor Exp. Co. v. Railroad & Pub. Utils. Comm'n*, 195 Tenn. 593, 602, 605-06, 261 S.W.2d 233, 237-38 (1953). Thus, providing the limited sort of judicial review available under a common-law writ of certiorari will guard against the risk that the courts might undertake to exercise power that does not belong to them.

. . .

The judicial review available under a common-law writ of certiorari is limited to determining whether the entity whose decision is being reviewed (1) exceeded its jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support its decision. *Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d at 363; *see also Stewart v. Schofield*, 368 S.W.3d 457, 463 (Tenn. 2012). We have explicitly approved the use of the common-law writ of certiorari to provide judicial relief from (1) fundamentally illegal rulings, (2) proceedings inconsistent with essential legal requirements, (3) proceedings that effectively deny parties their day in court, (4) decisions that are beyond the decision-maker's authority, and (5) decisions that involve plain and palpable abuses of discretion. *State v. Lane*, 254 S.W.3d at 355 (quoting *Willis v. Tennessee Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003)). However, we have also held that:

> the common law-writ [of certiorari] ... may not be resorted to for the correction of technical or formal errors, not affecting jurisdiction or power, or for the correction of defects that are not radical, amounting to an illegality that is fundamental, as distinguished from an irregularity.

*State ex rel. McMorrow v. Hunt*, 137 Tenn. 243, 249, 192 S.W. 931, 933

(1917).

> A common-law writ of certiorari proceeding does not empower the courts to redetermine the facts found by the entity whose decision is being reviewed. *Tennessee Waste Movers, Inc. v. Loudon Cnty.*, 160 S.W.3d 517, 520 n.2 (Tenn. 2005); *Cooper v. Williamson Cnty. Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987). Accordingly, we have repeatedly cautioned that a common-law writ of certiorari does not authorize a reviewing court to evaluate the intrinsic correctness of a governmental entity's decision. *See, e.g., Stewart v. Schofield*, 368 S.W.3d at 465; *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997). Similarly, we have noted that reviewing courts may not reweigh the evidence or substitute their judgment for the judgment of the entity whose decision is being reviewed. *See, e.g., State v. Lane*, 254 S.W.3d at 355 (quoting Robinson v. Clement, 65 S.W.3d at 635); *Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d at 363.

*Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 728-29 (Tenn. 2012).

## IV.   DISCUSSION

In the case at bar, the chancery court was tasked with reviewing the decision of the Finance Committee to determine whether it (1) exceeded its jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support its decision. *See id.* After reviewing the record, the chancery court concluded that "[t]he decision of the Finance Committee to award the contract to JEA was arbitrary and capricious based upon the scoring of the bid matrix." It also found that "there was no material evidence to support the conclusions given by the Committee's expert that the 'other costs' to move the equipment would amount to an additional $600,000 to $750,000 and an additional $150,000 to change the IP addresses," and the Committee "needs to be provided with the basis for these conclusions and the documentation to support these conclusions."

Madison County and JEA argue that the trial court exceeded the limited scope of review that is permissible pursuant to a common law writ of certiorari. They argue that the chancery court reweighed the evidence before the Finance Committee and substituted its judgment for that of the Finance Committee. JEA further argues that it was not the role of the chancery court to rewrite the bid request. We agree with these contentions.

For review under a common law writ of certiorari, the court "may review the record solely to determine whether it contains any material evidence to support the decision because a decision without evidentiary support is an arbitrary one." *Leonard Plating Co.*, 213 S.W.3d at 904. This limited review of the evidence has been described as follows:

- 14 -

The function of the reviewing court is limited to asking whether there was in the record before the fact-finding body *any* evidence of a material or substantial nature from which that body *could* have, *by reasoning from that evidence*, arrived at the conclusion of fact which is being reviewed. If there is such evidence in the lower record, the court must affirm the lower tribunal's fact-finding. To justify vacating a fact-finding there must be no evidence from which the lower body's finding could have been reached by reasoning from the evidence. If there was no such evidence, then the fact-finding is illegal, arbitrary, and capricious, and it is the duty of the reviewing court to vacate that finding.

*Massey v. Shelby Cnty. Ret. Bd.*, 813 S.W.2d 462, 465 (Tenn. Ct. App. 1991) (quoting B. Cantrell, *Review of Administrative Decisions by Writ of Certiorari in Tennessee*, 4 Mem. St. U. L. Rev. 19, 29-30 (1973)). In this context, "material evidence" means "relevant evidence that a reasonable person would accept as adequate to support a rational conclusion." *Leonard Plating Co.*, 213 S.W.3d at 904 (citing *Lafferty*, 46 S.W.3d at 759; *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992); *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965)). "The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Id.* Thus, the fact that material evidence exists in the record "to support another possible result . . . does not mean that the [] ultimate decision was unsupported by material evidence." *Sporting Club of Tenn., Inc.*, 2022 WL 4349796, at *7. "While two contrary positions cannot both be supported by a preponderance of the evidence, each such position can be supported by material evidence." *Id.* We must bear in mind that "the court's primary resolve is to refrain from substituting its judgment for that of the local governmental body."[3] *McCallen v. City of Memphis*, 786 S.W.2d 633, 641 (Tenn. 1990). Thus, the decision is "presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action." *Id.*

Here, the Finance Committee heard from an E-Rate consultant, Rosemary Enos, who had worked in connection with the E-Rate program for 24 years, across the East Coast and central United States, since the program began. She stated that if the School System changed service providers, it would lead to "an outright cost" of $600,000 to $750,000 to move the School System's equipment out of the JEA network operation center. She also calculated 20 hours of work that would be required for changing each of the School System's 111 servers, which exceeded 2,000 hours and was estimated to cost $150,000. Thus, she explained that even though Charter's price of E-Rate eligible services was lower,

---

[3] "Since procuring goods and services is the type of routine activity that is best left to governmental officials, most courts have recognized that public procurement authorities have wide discretion with regard to accepting bids or any of the other details of entering into a contract." *Metro. Air Rsch. Testing Auth., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 842 S.W.2d 611, 619 (Tenn. Ct. App. 1992) (citations omitted).

"overall you're still saving quite a bit of money to leave that equipment where it is and not having [to] rebuild that connection or rebuild it offsite." She said the "other item" that was discussed and considered in the decision-making process was the timeframe for the change. Ms. Enos said that if the School System's scheduled start date for service was not met, then it may be responsible for the full cost of the services in the interim, which would be "out-of-pocket" without any E-Rate funding. Ms. Enos's explanation was consistent with the "Notes from the evaluation conversation" regarding all four proposals, which noted that changing IP addresses would be costly both financially and in terms of time; JEA's network operation center was located in downtown Jackson; and JEA stated that service could be achieved by July 1 while Charter did not guarantee that its service would be up and running by then. This constitutes "relevant evidence that a reasonable person would accept as adequate to support a rational conclusion." *See Leonard Plating Co.*, 213 S.W.3d at 904. Therefore, "it is material evidence, of which there is more than a scintilla." *Sporting Club of Tenn.*, 2022 WL 4349796, at *6.

We cannot agree with the trial court's determination that "there was no material evidence to support the conclusions given by the Committee's expert" and that the Committee "needs to be provided with the basis for these conclusions and the documentation to support these conclusions." When questioned by various Committee members at the end of the hearing, Ms. Enos provided further explanations for her calculations, as set forth in detail earlier in this opinion. She said her opinion was based on her experience with other districts and businesses and also her conversations with "all of the IT folks" in the IT department. She said they had considered which equipment would have to be moved right away and what would not, the cost of moving the equipment, the number of people that would be required to move it and set it back up, the number of hours it would take "of their time and outside time," and "having to recreate the essentials without dropping the service." Considering that Ms. Enos has decades of experience with the E-Rate program and other school districts in numerous states, her opinion constitutes material evidence even in the absence of supporting documentation. It was not the role of the chancery court to reweigh the evidence before the Committee. *See Heyne*, 380 S.W.3d at 729.

This Court considered a similar scenario in *Leonard Plating Co.*, 213 S.W.3d at 900. In that case, the trial court had reviewed a decision of the Metropolitan Wastewater Hearing Authority under the common law writ of certiorari. *Id.* The Authority had conducted a full hearing and heard testimony from the assistant director for Metro Water Services, who had over thirty years of experience working for Metro. *Id.* at 902. However, the appellee had called other witnesses to support its opposing position. *Id.* The Authority ultimately voted to uphold an assessment against the appellee. *Id.* Following a review of the record, the trial court overturned the decision of the Authority, finding that the record did not contain material evidence to supports its decision. *Id.* at 903. The Metro Government appealed, arguing that the trial court "exceeded the permissible scope of review under a common-law writ of certiorari by improperly weighing the evidence rather

than simply determining whether the record contained material evidence to support the Authority's decision." *Id.* We agreed. Although we "commend[ed] the trial court's careful review of the record," we found that it "exceeded its authority by weighing the evidence." *Id.* The trial court had found the testimony of the assistant director for Metro Water Services "equivocal and inconclusive," then "turned its attention" to the evidence presented by the appellee, finding that it "detract[ed]" from Metro's position. *Id.* at 905. This, we explained, "overstepped the permissible boundaries of the search for material evidence." *Id.* Metro presented "material evidence upon which a reasonable person could rely to make a rational decision," so the trial court should not have "went further and weighed the Metropolitan Government's evidence against the evidence offered by [the appellee]." *Id.* "This a trial court cannot do when reviewing a board's or agency's decision pursuant to a common-law writ of certiorari." *Id.*

We reach the same conclusion here. The chancery court was heavily focused on the bid scoring matrix completed by the School System and comparing the scores to the information provided by Charter, proceeding with the apparent misconception that the matrix was completed by the Finance Committee and part of its decision. It was not.[4] It was a document obtained by Charter pursuant to an Open Records Act request, which Charter submitted as an exhibit at the hearing before the Committee. The chancery court was not tasked with weighing this evidence, recalculating the scores awarded by the School System, or making a fresh determination of which was the lowest and best bid. *See, e.g.*, *Sporting Club of Tenn., Inc.*, 2022 WL 4349796, at *6 ("Our standard of review in this matter is narrow. We do not make a fresh determination as to whether the Sporting Club's application should be granted. Rather, in keeping with the limited and deferential common law writ of certiorari standard, we review whether the Board's decision was supported by material evidence"); *Parking Guys, Inc. v. Metro. Gov't of Nashville & Davidson Cnty. ex rel. Traffic & Parking Comm'n*, 605 S.W.3d 451, 462-63 (Tenn. Ct. App. 2019) ("The

---

[4] We recognize that "[a] decision with evidentiary support can be arbitrary or capricious if it amounts to a clear error in judgment, and is not based on any course of reasoning or exercise of judgment, or disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Moss v. Shelby Cnty. Civ. Serv. Merit Bd.*, 665 S.W.3d 433, 441 (Tenn. 2023) (quotations omitted). However,

> If there is room for two opinions, a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though [a reviewing court] think[s] a different conclusion might have been reached. The "arbitrary or capricious" standard is a limited scope of review, and a court will not overturn a decision of an agency acting within its area of expertise and within the exercise of its judgment solely because the court disagrees with an agency's ultimate conclusion.

*Id.* Here, the chancery court found that "the points allocated by the Committee" appeared to be arbitrary and capricious and concluded that "[t]he decision of the Finance Committee to award the contract to JEA was arbitrary and capricious based upon the scoring of the bid matrix." Again, however, the scoring was not performed by the Committee, it was by the School System, who made a recommendation to the Finance Department before *it* awarded the bid that was ultimately upheld by the Finance Committee.

question before us [] is not what the best evidence was but rather is there material evidence in the record to support the Commission's decision. . . . We do not hold herein that the Commission made the best or wisest decision. We hold only that there was material evidence to support the Commission's decision, and that its decision was not arbitrary."). Instead, the chancery court was to decide whether material evidence existed to support the decision of the Committee. Charter continues to argue on appeal that "[t]he Finance Committee *incorrectly* affirmed the Competitive Bid award to JEA as [Charter] had t[he] lowest and best bid."[5] (emphasis added). Thus, "[i]t bears repeating that common law writ of certiorari is simply not a vehicle which allows the courts to consider the intrinsic correctness of the conclusions of the administrative decision maker." *Walker v. Metro. Bd. Of Parks And Recreation*, No. M2007-01701-COA-R3-CV, 2009 WL 5178435, at *12 (Tenn. Ct. App. Dec. 30, 2009); *see, e.g.*, *Powell v. Parole Eligibility Rev. Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994) ("[T]he plaintiff's complaint merely alleges that the Board made a mistake in calculating his release eligibility date. Thus, he attacks the *intrinsic correctness* of the decision, a question beyond the scope of review under the common law writ.").

For similar reasons, we disagree with the chancery court's conclusion that the costs for moving the equipment, changing the IP addresses, and the equipment storage rental fee "should have been part of the competitive bid process so that all of the other competitors could submit bids and address this issue," and the School System could be "better informed" and "evaluate with much better exactitude what these costs would be." In connection with this issue, Charter insists that the evidence regarding the network operation center "was an improper consideration in evaluating the bids" and that the Finance Committee "improperly relied heavily" on the costs related to changing providers when this was not "part of the competitive bid process." Again, however, our standard of review is narrow and extremely limited. "'[T]he trial court must apply a limited standard of review to decisions already made by administrative officials, rather than address the issue de novo as the initial decision maker.'" *Butler v. Tenn. Bd. of Nursing*, No. M2016-00113-COA-R3-CV, 2016 WL 6248028, at *9 (Tenn. Ct. App. Oct. 25, 2016) (quoting *State ex rel. Moore & Assocs., Inc. v. West*, 246 S.W.3d 569, 574 (Tenn. Ct. App. 2005)). In the absence of any showing that the Finance Committee (1) exceeded its jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support its decision, we discern no basis for the chancery court's imposition of these additional restrictions on the bidding process so that the School System could be "better informed." *See Heyne*, 380 S.W.3d at 729. The bid plainly stated that "Other Cost Factors" would be considered, which specifically included the "price of ineligible goods and services" and the "price of changing providers." Charter has not

---

[5] Charter's brief quotes a County policy providing that "[c]ontracts are awarded to the lowest bidder provided the bidder meets the stated specifications and has the ability to perform the services or provide the materials," but Charter omits the latter part of the same sentence, which states, "provided that the school system may reject any and all bids."

shown that this was illegal, nor did the chancery court find that it was.[6]

In support of its position that the equipment storage rental fee had to be included in the competitive bid process or else it was an "improper consideration," Charter relies on the following county purchasing policy that is generally applicable for all agencies and departments:

> All "like items", those items or services that are able to be combined and purchased from a single source shall be *considered as* a single purchase. No effort to circumvent this will be allowed. Example: The dividing of what should be a single purchase, as per the above definition of "like items" onto two or more purchase orders in an attempt to keep each under the bid and quotes limitations as stated in section A.[7]
>
> Anticipated purchases of "like items or services" from a single supplier which would exceed the established bid and quote limitations for the current budget year are also to be *considered as* a single purchase for audit purposes.

(emphasis added). This policy regarding what the County would "consider as" a single purchase for purposes of its bid and quote limitations for purchase orders simply does not support Charter's position regarding what was required to be set forth in the competitive bid. Moreover, the County contends that an equipment storage rental contract and a

---

[6] We note that Charter did not argue during the administrative proceedings that the equipment storage rental and other costs should have been part of the competitive bidding process. Thus, to the extent that Charter is alleging an unlawful procedure, that issue is waived. *See Emory v. Memphis City Schs. Bd. of Educ.*, 514 S.W.3d 129, 147 (Tenn. 2017) ("One appearing before an administrative tribunal must make timely objections to procedural errors and must raise the errors at the administrative level in order to preserve them for consideration in a petition for judicial review."). However, it is not clear from Charter's brief whether it is attempting to allege some illegal or arbitrary action related to the bid process.

In the argument section of its brief on appeal, Charter summarily states, "The FCC's competitive bidding rule confirms that such information was required to be disclosed. 47 U.S.C. § 54.503(a), Note." We presume that Charter intended to cite 47 *C.F.R.* § 54.503(a), but we nevertheless consider this skeletal argument waived. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Charter also suggests that the information was required to be disclosed due to the School System's policy regarding "full and open competition." However, the policy it cites, when read in context, states, "All procurement transactions must be conducted in a manner providing full and open competition consistent with 2 C.F.R § 200.319." Charter fails to mention this latter half of the policy and does not provide any analysis of whether the transaction was conducted in manner consistent with 2 C.F.R § 200.319. As such, we deem this argument skeletal and waived as well.

[7] "Section A" provides that purchases of $6,999.99 or less may be contracted for by the department head without the requirement for price quotations or formal bids, purchases from $7,000.00 to $24,999.99 require price quotations but not formal bids, and purchases of $25,000.00 and above require formal sealed bids.

contract for internet access service and wide area network connectivity are not "like items" when one is eligible for E-Rate funding and the other is not.  In any event, Charter has not shown that *the Committee* acted illegally or arbitrarily by considering the evidence related to the network operation center.

As an alternative argument on appeal, Charter maintains that the Finance Committee improperly upheld the competitive bid award even though the School System did not follow the proper procedure for the bid.  Charter contends that the School System signed the contract "before formal approval and award of the bid" by the Finance Department and submitted the E-Rate form with related "procedural irregularities."  Charter notes that the chancery court did not address its arguments related to the School System's alleged failure to follow the proper procedures.  However, Charter claims that this error in procedure provides an alternative basis for reversing the decision of the Finance Committee.  The County argues that the School System's premature execution of the contract simply meant that the contract was not binding on the County until the bid was formally awarded by the Finance Department.  To briefly recap the timeline, the School System signed the contract with JEA on March 23 and submitted its application for E-Rate funding ahead of the March 25 deadline.  At that time, the Finance Department had not formally approved the bid.  However, the Finance Department did formally approve the bid on April 15, prior to the hearing before the Finance Committee.

"Not every procedural defect provides a basis for judicial relief under the common law writ of certiorari."  *Waste Servs. of Decatur, LLC v. Cnty. of Lawrence*, No. M2011-01947-COA-R3-CV, 2012 WL 3329621, at *4 (Tenn. Ct. App. Aug. 14, 2012). According to the Tennessee Supreme Court,

> We have explicitly approved the use of the common-law writ of certiorari to provide judicial relief from (1) fundamentally illegal rulings, (2) proceedings inconsistent with essential legal requirements, (3) proceedings that effectively deny parties their day in court, (4) decisions that are beyond the decision-maker's authority, and (5) decisions that involve plain and palpable abuses of discretion. *State v. Lane*, 254 S.W.3d at 355 (quoting *Willis v. Tennessee Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003)). However, we have also held that:
>
> > the common law-writ [of certiorari] ... may not be resorted to for the correction of technical or formal errors, not affecting jurisdiction or power, or for the correction of defects that are not radical, amounting to an illegality that is fundamental, as distinguished from an irregularity.
>
> *State ex rel. McMorrow v. Hunt*, 137 Tenn. 243, 249, 192 S.W. 931, 933 (1917).

- 20 -

*Heyne*, 380 S.W.3d at 729. Thus, the common law writ of certiorari is not designed to correct mere errors of procedure; "[i]t contemplates only 'fundamental illegalit[ies].'" *Kaplow v. City of Gatlinburg Bd. of Adjustments & Appeals*, No. E2014-00347-COA-R3-CV, 2015 WL 3964212, at *3 (Tenn. Ct. App. June 30, 2015) (quoting *McGee v. State*, 340 S.W.2d 904, 906 (Tenn. 1960)). In *Waste Services*, for example, Lawrence County's request for proposals stated that final selection would be made by the Lawrence County Solid Waste Committee and the Purchasing Committee, but the county never submitted the proposals to the Solid Waste Committee. 2012 WL 3329621, at *4. This Court declined to find that this error was inconsequential because, without any separate meeting of the Solid Waste Committee, it was impossible to know what action it would have taken. *Id.*

Here, the County attorney conceded at the hearing before the Finance Committee that a "misstep" had occurred with the timing of the School System's contract. However, by the time of the hearing before the Finance Committee, the Finance Department had issued its formal bid award to JEA. Notably, then, the alleged procedural error occurred earlier in the process and was not committed by the Finance Committee whose decision is under review. Thus, we conclude that this procedural misstep by the School System is among the class of errors that the common law writ of certiorari is not designed to correct, including "technical or formal errors, not affecting jurisdiction or power," or "defects that are not radical, amounting to an illegality that is fundamental, as distinguished from an irregularity." *Heyne*, 380 S.W.3d at 729.

Next, Charter raises an additional issue that was argued for the first time in chancery court but not addressed in the chancery court's order.[8] Charter argues that "due to the illegal arrangement with JEA, JEA is not a qualified bidder." Specifically, Charter suggests that "state, local, and federal law restrict[] applicants from receiving anything of

---

[8] We note that

> In determining the question of whether new evidence may be introduced before the reviewing court in a proceeding under the common-law writ, a distinction must be drawn between the different types of legal questions which may be presented.
>
> Laying aside for the moment the question of sufficiency of evidence to support administrative fact findings, it may be stated generally that new or additional evidence may be received by the reviewing court on the issue of whether the lower tribunal exceeded its jurisdiction or in some manner acted illegally, arbitrarily, or capriciously. The petition might allege, for example, that the lower tribunal's action was based upon some ulterior motive. Obviously new evidence may be introduced on such an issue which goes to the legality of the lower tribunal's action, because the reviewing court determines such issues as an original matter. On such an issue the reviewing court weighs the evidence before it and determines by preponderance of the proof whether the lower tribunal acted illegally or not.

*Freeman v. City of Chattanooga*, No. E2010-01286-COA-R3-CV, 2011 WL 1197676, at *3-4 (Tenn. Ct. App. Mar. 31, 2011) (quoting *Massey*, 813 S.W.2d at 465).

value outside the services contained in a bid *in exchange for* awarding a contract." (emphasis added). According to Charter, "if JEA has effectively tied its offer of server storage to its selection as E-Rate provider, that would constitute an unlawful condition under federal E-Rate rules as well as under state and local law and disqualify JEA." At the same time, however, Charter concedes that "[i]t is unclear, based on the record, what the [School System's] contractual relationship with JEA is as it relates to the equipment storage." Charter also admits that "Ms. Enos failed to explain why [the School System] would have to move the servers at all." Thus, Charter recognizes that "there was no explanation for why [the School System] could not continue to use the existing bunker." Notably, the separate equipment storage rental contract is not in the record before this Court. Charter's counsel was in possession of the rental contract and referred to it during the hearing in chancery court, but it was not admitted into evidence. It was Charter's burden to establish any alleged illegality. *See McCallen*, 786 S.W.2d at 641. Based on the record before us, Charter simply has not shown that anything was wrongfully received "in exchange for" the awarding of the contract. More importantly, the legality of any separate equipment storage rental contract between JEA and the County is not the issue before this Court. We are reviewing the decision of *the Finance Committee* to uphold the bid award for wide area network and internet access services to JEA, in light of Charter's allegation that the bid award was illegal because JEA was disqualified.

Charter continues to insinuate on appeal that JEA might be providing equipment storage for free, citing rules regarding gifts and "free services." This was the same approach taken by Charter's representatives during the hearing before the Finance Committee. Its sales manager noted that the Director of Technology for the School System had listed as one of its four reasons for choosing JEA that it was currently providing access to a secured bunker for equipment. He stated:

> ["]JEA is currently providing access to a concrete secured bunker that houses several of our mission critical servers.["] You know, the saying is what's that got to do with the price of tea in China? There is no relevancy there, if there is any relevancy there, in E-rate there are very rigid rules that you can't give something free in order to get a bid on something that's E-rate eligible. That's a big no-no, you can't do that, you can't do quid pro quo, we'll give you this if you give us that so there is not – if any relevancy, it's another red flag.

Mr. Brones said "the fact that you all house that – that you all are able to house some servers for free in [JEA's] warehouse, [that's] against the law." Counsel for Charter then stated during his closing statement:

> . . . I'm not going [to] pass muster on it but it is fundamental in the competitive bid process that you cannot give any sort of value to the entity that has issued the bid. I'm not the school board's lawyer but this issue,

whenever the Federal government looks at it is going to cause big problems potential[ly] for the school board the fact that it says that JEA is currently providing access to a concrete secure bunker that houses several of our mission critical servers. There is no evidence that there is rent being paid and so that's a freebie and that's prohibited in the competitive bid process.

However, when JEA's representative spoke at the hearing, he said that to the extent any illegality had been alleged regarding the servers, "there is absolutely charges for that equipment." Ms. Enos also addressed the issue. She said that during the decision-making process, they had a discussion about "the rental fee" at the current network operation center and determined that the School System would likely pay a similar rate at any other location, whether it was with another service provider or elsewhere. She explained that most service providers have network operation centers and where space can be rented for the equipment. Thus, the record does not support Charter's continued suggestion that JEA was giving the School System an illegal "freebie." The facts presented to the Committee show that the School System was paying rent for the equipment storage.

Charter did not raise any alternative argument *before the Committee* to suggest that the contractual relationship was illegal if the School System was in fact paying rent. However, Charter's precise arguments regarding the legality of contract have been somewhat of a moving target. Before the chancery court, Charter raised a new "conflict of interest" argument regarding the separate contract, which it continues to pursue on appeal. Charter argues that "*JEA's conflict of interest* by providing an unrelated service" makes "the award illegal and disqualif[ies] JEA from future consideration." (emphasis added). As support for this argument, Charter quotes Tennessee Code Annotated section 5-21-121(b). The statute, read in context, provides:

§ 5-21-121. Conflict of interest

(a)(1) The director, purchasing agent, members of the committee, members of the county legislative body, other officials of the county, members of the board of education, members of the highway commission, and employees of the finance department and purchasing department shall not have a direct interest in the purchase of supplies, materials, equipment, or contractual services for the county. . . .
(2) Such persons shall not have an indirect interest in the purchase of supplies, materials, equipment, or contractual services for the county unless the person publicly acknowledges the interest. . . .
(b) No firm, corporation, partnership, association or individual furnishing any such supplies, materials, equipment or contractual services, shall give or offer nor shall the director or purchasing agent or any assistant or employee accept or receive directly or indirectly from any person, firm, corporation, partnership or association to whom any contract may be awarded, by rebate,

- 23 -

gift or otherwise, any money or other things of value whatsoever, or any promise, obligation or contract for future reward or compensation.

Tenn. Code Ann. § 5-21-121.  A subsequent section, Tennessee Code Annotated section 5-21-125, then provides:

Any official or employee of the county, or of any institution or agency thereof, who fails or refuses to perform the duties required by this chapter or who fails or refuses otherwise to conform to this chapter commits a Class C misdemeanor, and is subject to removal from office or position.

Section 5-21-121 is one of various Tennessee statutes "that generally govern when a state or local government official has a conflict of interest and what action must be taken to mitigate any such conflict of interest."  Tenn. Op. Att'y Gen. No. 12-104, at *1 (Nov. 9, 2012).  "Tennessee courts have long recognized that such conflict of interest statutes are generally intended to ensure 'that a public official may not contract with the body of which he is a member, because it may lead to other contracts very detrimental to the public interests.'"  *Id.* (citing *Madison County v. Alexander*, 116 Tenn. 685, 688, 94 S.W. 604 (1906)).  Thus, section 5-21-121 sets forth "prohibited conflicts of interest for certain officials of counties operating under the County Financial Management System Act of 1981."  *Id.*  Clearly, section 5-21-121 does not establish "JEA's conflict of interest," rendering its contract or the bid award "illegal" or disqualifying JEA, as Charter suggests.

Finally, we note that Charter filed a motion to consider post-judgment facts pursuant to Tennessee Rule of Appellate Procedure 14, asking this Court to consider the fact that the County issued a new request for bids for E-Rate eligible internet access service and wide area network after oral argument in this Court.  Charter suggested that Madison County took such an action in an effort to "moot this appeal."  However, Madison County filed a response disputing this assertion and claimed that it was simply "preemptively rebidding the contract," as the chancery court ordered, so that the County could comply with E-Rate filing deadlines in the event that this Court affirmed the trial court and directed rebidding of the contract.  Madison County stated that it could withdraw the bid in the event that this Court reversed the chancery court.  Although Madison County opposed Charter's motion to consider post-judgment facts, it filed its own motion to consider post-judgment facts thereafter, asking this Court to consider the fact that it issued a bid award notification to JEA.  Madison County asserted that this fact was relevant to this Court's decision should we determine that the contract needed to be rebid again.

Given our conclusions in this opinion, "consideration of these post-judgment facts would not affect the positions of the parties or the subject matter of the action."  *Druek v. Hydrogen Engine Ctr., Inc.*, No. E2019-02142-COA-R3-CV, 2020 WL 6375393, at *6 (Tenn. Ct. App. Oct. 30, 2020) (citing Tenn. R. App. P. 14(a)).  As such, we deny both motions to consider post-judgment facts.  *See, e.g.*, *Lovin v. State*, 286 S.W.3d 275, 283

(Tenn. 2009) ("[B]oth this Court and the Court of Appeals have declined to invoke Tenn. R. App. P. 14 with regard to [] facts that are irrelevant[.]"); *Haiser v. Haines*, No. E2013-02350-COA-R3-CV, 2014 WL 7010723, at *6 (Tenn. Ct. App. Dec. 12, 2014) (denying a motion to consider post-judgment facts where this Court did "not believe this development has any bearing on the positions of the parties in this lawsuit," and "the inclusion of these facts in our consideration would not have altered the outcome of this appeal in any way as to any issue before us"); *see also* Tenn. R. App. P. 14(a) (stating that consideration of post-judgment facts "lies in the discretion of the appellate court" and "generally will extend only to those facts . . . affecting the positions of the parties or the subject matter of the action").

## IV.   CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby reversed and remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, Charter Communications Operating, LLC, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE